T.C. Memo. 2017-194

UNITED STATES TAX COURT

CAMBRIDGE PARTNERS, L.P., KENNETH I. NOWAK, STATE OF NEW
JERSEY APPOINTED RECEIVER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5831-03, 5833-03,        Filed October 2, 2017.
2626-04, 2627-04.

CP and CPII are limited partnerships.  Their sole general
partner and tax matters partner ceased to be a general partner on Mar.
3, 2000, because of a consent decree appointing a receiver that
stemmed from the partner's guilty plea on three felony counts.  KN,
in his capacity as the State-court-appointed receiver, filed AARs and
thereafter a petition for adjustment of each partnership's partnership
items under I.R.C. sec. 6228 for the 1997, 1998, and 1999 taxable
years.  R moved to dismiss the cases for lack of jurisdiction on the

[1]The following cases are consolidated herewith:  Cambridge Partners II,
L.P., Kenneth I. Nowak, State of New Jersey Appointed Receiver, docket Nos.
5833-03; Cambridge Partners II, L.P., Kenneth I. Nowak, State of New Jersey
Appointed Receiver, docket No. 2626-04; and Cambridge Partners, L.P., Kenneth
I. Nowak, State of New Jersey Appointed Receiver, docket No. 2627-04.

[*2]  basis that the petitions and the underlying AARs were not filed by the tax matters partner.

Held:  R's motions to dismiss for lack of jurisdiction will be granted because the receivership has been terminated by the State of New Jersey and there remains no party with legal standing to pursue this litigation.

Flavio L. Komuves, for petitioners.[2]

Joseph J. Boylan and Lydia A. Branche, for respondent.

MEMORANDUM OPINION

WHERRY, Judge:  These cases concern four petitions for adjustment of partnership items under section 6228.[3]  The cases are now before the Court on respondent's motions to dismiss for lack of jurisdiction and are consolidated solely for purposes of this opinion.  The issue for decision is whether this Court has jurisdiction to decide these cases.  The problem is that with the termination of the receivership there remains no representative of the limited partnerships to maintain and prosecute these cases.  Further, neither the Tax Court petitions nor the

---

[2]Prior to September 29, 2016, and the termination of the receiverships by the State of New Jersey petitioners were represented by George F. Nagel.

[3]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** underlying refund claims, Forms 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR), were filed by the tax matters partner (TMP) as required by section 6228 and Rules 240 and 241.

## Background

The information below is based upon an examination of the pleadings, moving papers, responses, and attachments submitted in connection with these cases. Factual recitations are meant to provide context for our analysis of respondent's motions and to set forth matters that appear undisputed. They do not, however, constitute findings of fact in the event of a subsequent trial or trials.

The partnerships are two New Jersey limited partnerships--Cambridge Partners, L.P., and Cambridge Partners II, L.P. (Cambridge I and Cambridge II or, collectively, the partnerships). Petitioner is a receiver appointed for them by the New Jersey Superior Court (superior court). Their primary place of business when the petitions were filed was in New Jersey.

New Jersey resident John C. Natale formed Cambridge I as the sole general partner during or about 1992 and subsequently created Cambridge II during or about January 1995. These entities were advertised as investment partnerships (hedge funds), and each promptly solicited investors to purchase whole and fractional interests in each entity. During their time in operation, the partnerships

[*4] amassed a total of approximately 90 and 140 investors, respectively. Mr. Natale was general partner and TMP of both and purportedly used the partnerships to manage investments on behalf of the partnerships' limited partners. Unfortunately, Mr. Natale's management led to immediate and sustained losses for both the partnerships and the partners. Rather than report the losses, however, Mr. Natale reported fictitious profits. In substance the partnerships quickly became, if they were not from the beginning, Ponzi schemes.

To that end, Mr. Natale fabricated the partners' monthly statements, sent fictitious information to trade and industry publications, cashed out redeeming investors with other investors' money and--as is most important in these cases-- provided false tax information to the limited partners and the Internal Revenue Service (IRS). Specifically, for at least the 1997, 1998, and 1999 tax years he reported fictitious information on the Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., that he provided to the partners and the Forms 1065, U.S. Return of Partnership Income, that he provided to the IRS. As a result, at least some of the partners, when they filed their Federal income tax returns, presumptively relying on the Schedules K-1, appear to have reported more income than they actually earned; and many suffered significant loses although they

[*5] thought they had income.  Consequently, in many if not all cases these partners may have paid more Federal income tax than they actually owed.[4]

Mr. Natale was not caught by law enforcement authorities and continued to provide false information to the limited partners and the IRS until he voluntarily surrendered to the New Jersey Attorney General's Office and acknowledged his fraudulent activities in 2000.  His confession and surrender to authorities was brought on in material part by the partnerships' inability to acquire sufficient new investors to meet their ongoing redemption obligations to old investors, resulting in the scheme's collapse.  By then, the divergence between Mr. Natale's misrepresentations and economic reality was dramatic.

Mr. Natale and his investment activities through the partnerships and a related entity, CAJ Trading, Inc., thereafter became the target of various criminal and civil proceedings in the State of New Jersey.  Mr. Natale was alleged by prosecutors and plaintiffs to have defrauded investors, communicated inflated

---

[4]Some partners apparently used tax-advantaged sec. 401(K) or individual retirement account funds for their investment(s) in the partnerships and therefore would have had no taxable income to report even if the Schedules K-1 had been accurate.  Other partners who withdrew their investments and fabricated profits may have actually made money at the expense of other investors and may have been subject to voidable preference "clawback" provisions.

[*6] asset and profitability figures for the partnerships, and misapplied new investor funds to cover redemptions of existing investors' partnership accounts.

In the resulting criminal case Mr. Natale pleaded guilty to felony counts of securities fraud, theft by deception, and misappropriation and was sentenced to 4 to 10 years in prison. In the civil case he consented to a finding that he had committed fraud in violation of New Jersey's securities laws. In a March 3, 2000, civil consent judgment, the superior court: (1) permanently enjoined Mr. Natale and the partnerships from engaging in the securities business, (2) ordered Mr. Natale and the partnerships to disgorge any money they had obtained in connection with the misconduct and to make restitution to the partners, and (3) appointed James R. Zazzali to serve as receiver for Mr. Natale and the partnerships pursuant to N.J. Stat. Ann. sec. 49:3-69 (West 2001).

In the consent judgment, the superior court specified the powers and responsibilities that Mr. Zazzali would have as receiver, ordering that he would:

> (i) immediately take into possession all of defendants' assets, including but not limited to holdings in all bank, brokerage, and trading accounts, and undertake all actions necessary or appropriate to maintain optimal value of those assets, including the power to liquidate any such assets;

> (ii) review all the books and records of and pertaining to defendants and report to the court within 90 days of this Order:

**[*7]**   (a) the identities of all of defendants' investors and creditors, past and present, and the status of their accounts;

(b) the financial conditions of defendants; and

(c) a preliminary plan to distribute monies to investors and creditors;

\*          \*          \*          \*          \*          \*          \*

(vii) have the full statutory powers to perform his duties, including the powers delineated in N.J.S.A. 49:3-69(c) and (d).

In May 2000, Mr. Zazzali was appointed to the New Jersey Supreme Court, and, on June 2, 2000, the superior court appointed Kenneth I. Nowak to replace him as receiver for the partnerships. In that capacity, Mr. Nowak reviewed the partnerships' books and records and identified the inaccurate tax information that Mr. Natale had reported to the partners and the IRS. This work required a considerable period.

In April of 2001 (as to 1997) and February or March of 2002 (as to 1998 and 1999) Mr. Nowak, in his capacity as receiver, filed on behalf of the partnerships amended returns, Forms 1065, and AARs for purposes of revising the amounts reported on the original partnership tax returns, Forms 1065, submitted by Mr. Natale. Explanatory statements included with the AARs represented that deception on the part of Mr. Natale had resulted in the reporting of fictitious profits and amounts on the original Federal tax returns and that a comprehensive

**[*8]** and time-consuming reconstruction of books and records had been undertaken to ascertain the correct figures.

During the course of the ensuing review of the AARs, the IRS attempted to find a limited partner for each of the partnerships willing to serve as TMP and in that capacity to ratify the AARs. However, none of the limited partners contacted by the IRS was willing to agree to serve as a TMP. After consideration, the IRS declined to treat the changes shown on the AARs as corrections of errors on the partnership returns, on the grounds that they were not signed by the TMP of either of the partnerships.

On April 17, 2003, petitions signed by Mr. Nowak were filed with this Court on behalf of the partnerships as to their respective 1997 taxable years. These petitions were followed on January 2, 2004, by respondent's above-described motions to dismiss the 1997 cases for lack of jurisdiction.

Thereafter, on January 30, 2004, the superior court issued the following order entitled "ORDER CONFIRMING THE AUTHORITY OF THE RECEIVER TO ACT AS TAX MATTERS PARTNER, <u>NUNC PRO TUNC</u>":

> [T]he Receiver is, and has been, authorized to act as, and take all actions required of, the Tax Matters Partner, on behalf of the Cambridge Entities, including, but not limited to the filing of documents, returns, amended returns, K-1s, Administrative Adjustment Requests and any and all other filings and petitions

**[\*9]** necessary or appropriate to carryout [sic] and fulfill the obligations of the Receiver, with and to the Internal Revenue Service, the United States Tax Court, any and all appeals, motions, or any related matter before or from the Internal Revenue Service and/or the United States Tax Court, including any other agency, court, or appellate tribunal (this shall include, but not be limited to, the filing of Administrative Adjustment Requests with the Internal Revenue Service, and all actions in connection with any state and federal agencies, all administrative matters and proceedings, administrative agencies, administrative courts, tax courts, and/or appellate review), <u>nunc pro tunc</u>, as of the date of the Receiver's initial appointment.

On February 10, 2004, a hearing was held on respondent's motions to dismiss the 1997 cases, and the motions were taken under advisement. Three days later, on February 13, 2004, Mr. Nowak filed a separate petition with the Court for each partnership with respect to the 1998 and 1999 AARs. On August 2, 2004, respondent moved to dismiss the cases concerning those AARs.

Thereafter, it appears the parties worked cooperatively to informally work out a procedure, agreeable to both sides, to resolve any inequities, although no formal written settlement agreement has been found by either party or filed with the Court. The receiver's report to the investors and his motion to the New Jersey Superior Court to close the receivership, respectively, stated that

> through litigation with the IRS, we were able to allow all of you to file amended tax returns to recoup the taxes you paid on fictitious profits in prior years * * *[A]t the time we sought to obtain this benefit for you several years ago, the [G]overnment had adamantly

**[*10]** opposed it and we pursued the matter successfully in the [T]ax [C]ourt.

and

> as a result of the litigation, the IRS ultimately agreed to allow the Receiver to coordinate the filing of returns and to allow the limited partners' prior returns to be amended. We believe, and the IRS also noted, that this was breaking new ground at the time, and was an enormous benefit for many investors who had paid taxes on the false profits. * * * As a result, we believe that the limited partners were able to obtain refunds on certain of their taxes for the false profits upon which they had previously reported and paid taxes. * * *

None of the limited partners has ratified the petition, agreed to serve as TMP, or agreed to participate in any of these cases. Respondent on June 6, 2016, filed a status report in an effort to bring these cases to a conclusion. Mr. Nowak, the putative TMP for the partnerships through counsel, Flavio Komuves, also filed status reports on August 10 and November 1, 2016.

## Discussion

### I. General Rules

#### A. Partnership Taxation and AARs

A partnership is not a tax-paying entity. Sec. 701; see Garcia v. Commissioner, 96 T.C. 792, 793 (1991). Although a partnership reports its income, gains, losses, deductions, and credits to the IRS on a Form 1065 information return, those partnership items pass through the partnership to its

**[*11]** partners, who are responsible for paying any Federal income tax resulting from them.[5]  Secs. 701, 702, 6031; see Garcia v. Commissioner, 96 T.C. at 793-794.  To facilitate this process, the partnership issues each partner a Schedule K-1 indicating that partner's share of the partnership items.  Each partner must then report that information to the IRS on a Form 1040, U.S. Individual Income Tax Return, or other equivalent form.

If any partner objects to how the partnership reported a partnership item--for example, if the partner believes that the partnership overstated its income ultimately resulting in an increased tax liability for the partner--the partner can seek an administrative adjustment of that partnership item by filing an AAR with the Secretary.  Sec. 6227(a).  The Secretary may act on the request in one of four ways:

> (1) process the request in the same manner as a claim for credit or refund with respect to items which are not partnership items,

> (2) assess any additional tax that would result from the requested adjustments,

> (3) mail to the partner * * * a notice that all partnership items of the partner for the partnership taxable year to which such request relates shall be treated as nonpartnership items, or

---

[5]Partnership items are defined in sec. 6231(a)(3).  See sec. 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs.

[*12] (4) conduct a partnership proceeding.

Sec. 6227(d). If the Secretary ultimately disallows an AAR filed pursuant to section 6227(d), depending on the action taken by the Secretary, the partner may file a refund claim or initiate a civil action for refund pursuant to section 7422. Sec. 6228(b).

In addition, the partnership's TMP can file an AAR on behalf of the partnership. Sec. 6227(c). When, as here, such an AAR is not treated by the Secretary as a substituted return, the Secretary may act on the AAR in one of three ways:

> (i) without conducting any proceeding, allow or make to all partners the credits or refunds arising from the requested adjustments,
>
> (ii) conduct a partnership proceeding under this subchapter, or
>
> (iii) take no action on the request.

Sec. 6227(c)(2)(A). If the Secretary does not allow any part of the TMP's AAR, the TMP may file a petition for adjustment of those partnership items with the Tax Court, the U.S. Court of Federal Claims, or the appropriate U.S. District Court. Sec. 6228(a).

[*13]  B.  Tax Matters Partner

The TMP role was introduced by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, secs. 402-406, 96 Stat. at 648, codified as amended at sections 6221 to 6233.[6]  See sec. 6231(a)(7).  TEFRA's primary purpose was to enhance the efficiency of partnership taxation.  Randell v. United States, 64 F.3d 101, 103 (2d Cir. 1995) (noting that the intended effect of TEFRA was to avoid "duplication of administrative and judicial resources and inconsistent results between partners").  To do so, it provided that--whenever possible--issues involving partnership items would be litigated and resolved in a central, partnership-level proceeding rather than in separate, partner-level proceedings.  See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 200 (2007) (stating that the purpose behind TEFRA was "to have a single point of adjustment for the IRS rather than having to make separate partnership item adjustments on each partner's individual return).

The creation of the TMP's role was one of many means by which Congress sought to enhance the efficiency of partnership taxation.  In a TEFRA partnership the TMP serves as the partnership's central representative before the IRS and the

---

[6]A partnership is subject to TEFRA if it has more than 10 partners or if certain other conditions not relevant here apply.  Sec. 6231(a)(1).

- 14 -

[*14] courts.  See Phillips v. Commissioner, 114 T.C. 115, 120-121 (2000) ("The

TMP is the central figure of partnership proceedings, and, consequently, the

TMP's status is of critical importance to the proper functioning of the partnership

audit and litigation procedures."), aff'd, 272 F.3d 1172 (9th Cir. 2001).  As a

TEFRA partnership's central representative, the TMP possesses important powers

and responsibilities, such as:  (1) keeping all partners informed of the status of the

administrative or judicial proceedings involving the adjustment of partnership

items, (2) having priority in choosing the forum in which the partnership will seek

judicial review, and (3) binding other partners to the terms of a settlement the

partnership reaches with the IRS.  See, e.g., secs. 6223(g), 6224(c)(3), 6226(a).

Given the importance of the TMP, the law provides a precise procedure for

determining who a partnership's TMP is:

> SEC. 6231(a)(7).  Tax matters partner.--The tax matters partner
> of any partnership is--
>
> (A) the general partner designated as the tax matters
> partner as provided in regulations, or
>
> (B) if there is no general partner who has been so
> designated, the general partner having the largest profits
> interest in the partnership at the close of the taxable year
> involved (or, where there is more than 1 such partner, the 1 of
> such partners whose name would appear first in an alphabetical
> listing).

[*15] If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner. * * *

Section 301.6231(a)(7)-1(l)(1), Proced. & Admin. Regs., provides that "a designation of a tax matters partner for a taxable year under this section shall remain in effect until" one of five specified events occurs. As relevant here, a TMP designation terminates if "[t]he partnership items of the tax matters partner become nonpartnership items under section 6231(c)". Id. subdiv. (iv).

The regulations promulgated under section 6231(c) state the following with respect to the appointment of a receiver:

> The treatment of items as partnership items with respect to a partner for whom a receiver has been appointed in any receivership proceeding before any court of the United States or of any State or the District of Columbia will interfere with the effective and efficient enforcement of the internal revenue laws. Accordingly, partnership items * * * arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner with respect to which the United States could file a claim for income tax due in the receivership proceeding shall be treated as nonpartnership items as of the date a receiver is appointed in any receivership proceeding before any court of the United States or of any State or the District of Columbia.

Sec. 301.6231(c)-7T(b), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6779, 6793 (Mar. 5, 1987). Accordingly, as of March 3, 2000, the day on which a receiver was appointed, Mr. Natale ceased to be the TMP of the partnerships for

**[*16]** any partnership taxable year for which respondent could file a claim for income tax due in Mr. Natale's receivership proceedings.

New Jersey law requires a receiver to, within 30 days following the date of his appointment, give notice requiring all creditors to present their claims in writing. N.J. Stat. Ann. sec 14A:14-15 (West 2001); see also sec. 6036; sec. 301.6036-1, Proceed. & Admin. Regs. (requiring receivers to give notice of their designation to the IRS within 10 days of appointment). The receiver in this case was appointed on March 3, 2000. As is relevant here, respondent could have filed a claim with the receiver for income tax due from Mr. Natale for the partnership taxable years 1997, 1998, and 1999, which are at issue in this case. See secs. 6501(a) and (b)(1), 6502(a) and (b); Internal Revenue Manual pt. 5.17.13.10.2 (July 9, 2012). Accordingly, pursuant to the regulations, Mr. Natale ceased to be the TMP for the partnerships for those tax years on March 3, 2000.

Detailed regulations promulgated in accordance with section 6231(a)(7) provide further guidance and requirements for selection of a TMP by the IRS but do not permit the designation of a limited partner as TMP except by the IRS under limited circumstances.[7] Sec. 301.6231(a)(7)-1(p)(3)(ii), (q), Proceed. & Admin.

---

[7]Those circumstances include where no general partner can be selected to serve as TMP. Sec. 301.6231(a)(7)-1(p)(3)(ii), Proceed. & Admin. Regs. The

(continued...)

**[*17]** Regs. The statute does not permit the designation of a nonpartner as TMP under any circumstances. See 1983 W. Reserve Oil & Gas Co. v. Commissioner, 95 T.C. 51, 62 (1990) (holding that a partnership's court-appointed receiver could not qualify as its TMP under the statute because he was never a partner in the partnership), aff'd without published opinion, 995 F.2d 235 (9th Cir. 1993); see also Mont. Sapphire Assocs., Ltd. v. Commissioner, 95 T.C. 477, 482 (1990) ("McAuliffe could not be selected by respondent as tax matters partner of Montana Sapphire for the same reason that he could not qualify under section 6231(a)(7)(A) or (B): he is not and never was a partner in the partnership.")

Under limited circumstances, Federal courts may appoint a TMP. See Comput. Programs Lambda, Ltd. v. Commissioner (Lambda), 90 T.C. 1124, 1127-1128 (1988); see also Transpac Drilling Venture 1983-63 v. United States, 16 F.3d 383, 389 (Fed. Cir. 1994). That authority is rooted not in section 6231(a)(7) but in the extrastatutory notion that a court possesses certain inherent powers to protect parties to the litigation before it and to effectively manage its docket. See Comput. Programs Lambda, Ltd. v. Commissioner, 90 T.C. at 1127 (stating that

---

[7](...continued)
regulations lay out a set of rules regarding the disqualification of a partner as TMP. The regulations are controlling here. Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 55-56 (2011).

[*18] the Court's authority to appoint a TMP stems from its "inherent powers as a Court"); see also Link v. Wabash R. Co., 370 U.S. 626, 630-631 (1962) ("The authority of a court to dismiss sua sponte for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").[8]

In Lambda, after a petition for readjustment had been properly filed, we appointed a limited partner TMP to fill the void left after the general partners were disqualified. See Comput. Programs Lambda, Ltd. v. Commissioner, 90 T.C. at 1125, 1128. In so doing, we invoked our inherent power to manage our docket and stressed the importance of a TMP in "protect[ing] the rights of partners interested in the partnership proceeding before us" and "assur[ing] the fair,

---

[8]The person appointed receiver and who filed the AARs in this case was not a partner in either partnership and could not qualify as a TMP under sec. 6231(a)(7). See Mont. Sapphire Assocs., Ltd. v. Commissioner, 95 T.C. 477, 482 (1990); 1983 W. Reserve Oil & Gas Co. v. Commissioner, 95 T.C. 51, 62 (1990), aff'd without published opinion, 995 F.2d 235 (9th Cir. 1983). There was no general partner other than Mr. Natale, who was no longer eligible to serve as TMP. Had a limited partner been appointed receiver or appointed in some assisting capacity to file or ratify the AARs, the Internal Revenue Service might have accepted and processed the AARs and the problem could have resolved itself.

[*19] efficient, and consistent disposition of partnership litigation pursuant to section 6621, et seq." Id. at 1127.

The Court's inherent power to manage its docket, however, is subject to two limitations. First, a court cannot use its inherent power to manage its docket for any other purpose. Our appointment of a TMP in Lambda was clearly aimed at docket management because we limited the TMP to "acting in an administrative capacity solely for the litigation of this case." Id. at 1128.

Second, a court cannot use its inherent power if doing so would violate or circumvent a statutory provision. See generally Degen v. United States, 517 U.S. 820, 823 (1996) ("The extent of * * * [inherent] powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority."). Although section 6231(a)(7) does not explicitly authorize a court to appoint a TMP, we did not circumvent that section in Lambda because of the limited nature of the court-appointed TMP's role. Specifically, the court-appointed TMP was merely a conduit for information from the Court to other interested partners, enabling the Court to effectively manage and resolve the TEFRA litigation before it--nothing more. See Comput. Programs Lambda, Ltd. v. Commissioner, 90 T.C. at 1128. The Court in Lambda recognized that it could

**[\*20]** not empower that TMP to act concerning a matter other than the particular litigation with respect to which that TMP was appointed.  See Degen, 517 U.S. at 823 ("In many instances the inherent powers of the courts may be controlled or overridden by statute or rule.").

In the wake of Lambda, we amended our Rules by adding Rule 250, which provides for the appointment and removal of a TMP by the Court.[9]  Rule 250.  Our stated purpose in adding Rule 250 was "so that there will always be a tax matters partner who is responsible for keeping each partner fully informed of the partnership action."  Rule 250 note, 90 T.C. 1379.  Accordingly, as in Lambda, we stressed the limited authority of a court-appointed TMP:  "Any action that the Court might take in either appointing a tax matters partner or removing a tax matters partner is for the limited purpose of the pending partnership action only."  Id.[10]

---

[9]In adding Rule 250(a), which permits us to appoint a TMP, we did not specifically address a situation involving a petition filed by a nonpartner.  See Rule 250 note, 90 T.C. 1378 ("Rule 250(a) deals with the situation where a petition is filed by a partner other than the tax matters partner and the petition fails to allege the name and current address of the tax matters partner[.]").

[10]Our authority to appoint a TMP derives from our inherent authority as a court--and not from sec. 6231(a)(7).  It is disputable and as yet undecided, by this Court, whether in exercising our inherent authority we are constrained to appoint as TMP an individual or entity that is qualified to serve as TMP under sec.

(continued...)

**[*21]** II.  <u>Analysis</u>

Under section 6228(a) and Rule 240, our jurisdiction over these cases is conditioned on:  (1) an AAR filed by the TMP that was not allowed in full and (2) a proper petition for adjustment filed by the TMP.  At issue is whether those jurisdictional prerequisites have been satisfied in this case, which depends upon whether Mr. Nowak was the TMP of the partnerships when he filed the AARs and the petitions in these cases.

At the outset we reiterate that section 6231(a)(7) does not permit a nonpartner, such as Mr. Nowak, to serve as TMP.  <u>See</u> <u>supra</u> pp. 16-17.  We also note that Mr. Nowak is not--and was never-- a partner in either partnership involved in these cases.  Nor does he contend otherwise.

Instead, in his responses to respondent's motions to dismiss, Mr. Nowak asserts that the Tax Court has the inherent nonstatutory authority to appoint a nonpartner as TMP and that the superior court enjoyed the similar authority to control its docket and empower its receiver to act as TMP on the partnerships' behalf.  Thus, the question now before us is whether any action that the superior court has taken or that we can now take permits Mr. Nowak to serve as TMP of

---

[10](...continued)
6231(a)(7).

[*22] Cambridge I and Cambridge II so as to permit us to continue to hear these cases on their merits.

    A.  <u>This Court Cannot Appoint a TMP in These Cases</u>.

We must have jurisdiction over a case in order to use our inherent power to appoint a TMP.  <u>See</u> <u>Transpac Drilling Venture</u>, 16 F. 3d at 389 ("We agree with the Court of Federal Claims that the court does not have inherent power to appoint anyone as TMP where the cases are not properly before the Court because the petitions were not properly filed.").  Stated another way, we cannot invoke our inherent power to appoint a TMP in order to bootstrap invoking our jurisdiction over these cases.  To use our inherent power for that purpose would be to abolish by judicial fiat the jurisdictional limitations of section 6228.[11]  Moreover, as discussed earlier, our inherent power to appoint a TMP and/or powers under Rule 250 do not permit us to give that TMP the powers that would be necessary to invoke our jurisdiction, namely the powers to file AARs and petition the Court.  <u>See</u> <u>supra</u> pp. 16-18.

---

[11]Petitioner alternatively asks us to appoint him "representative" of the partnerships with the power to file AARs and petitions even if he is not qualified to serve as TMP of the partnerships.  Whether we refer to a court-appointed TMP as a "representative" rather than a "TMP" is merely a matter of semantics.  No matter what we now decide to call Mr. Nowak, we cannot retroactively give ourselves jurisdiction over these cases.

**[*23]** B. <u>Mr. Nowak Is Not Now a TMP of Either Partnership Who May Pursue These Cases</u>.

Whether Mr. Nowak was TMP of the Cambridge partnerships when he filed the AARs and Tax Court petitions in these cases turns on the effect of the superior court's consent judgment and nunc pro tunc order purporting to empower him to act as TMP of the Cambridge partnerships for the purpose of filing the AARs and followup Tax Court petitions.[12]

Whether Mr. Nowak qualified as TMP of the partnerships when he filed the AARs and the Tax Court petitions is unquestionably a matter of Federal tax law. As such, that issue is not governed by a State court's orders and judgments. <u>See</u> <u>Miller v. Commissioner</u>, 114 T.C. 184, 196 (2000) (noting that "a State court cannot determine issues of Federal tax law"); <u>Grober v. Commissioner</u>, T.C. Memo. 1972-240, 31 T.C.M. (CCH) 1179, 1191 (1972) ("[T]he question of

---

[12]It is also critical whether at the time the respective AARs were filed Mr. Nowak was the TMP of each partnership by virtue of inherent authority properly used by the New Jersey Superior Court. For that to be true the January 2004 nunc pro tunc order must be treated as if it were a valid order issued in March 2000 when a receiver was initially appointed. <u>See</u> <u>Johnson v. Commissioner</u>, 45 T.C. 530 (1966). This Court is generally unwilling to give effect to such orders when, as here, they reflect "an intention or design originating subsequent to" the date of the original order. <u>Newman v. Commissioner</u>, 68 T.C. 494, 501 (1977). While the New Jersey Superior Court from the start sought to wind up the partnerships in an orderly fashion, it appears to have been unaware of the need to appoint a TMP until shortly before the <u>nunc</u> <u>pro</u> <u>tunc</u> order doing so was issued.

[*24] whether or not a joint venture exists for Federal tax purposes must be decided under standards prescribed in the Internal Revenue Code and is not controlled by the determinations of a State court."), aff'd sub nom. Estate of Kahn v. Commissioner, 499 F.2d 1186 (2d Cir. 1974); see also Nieto v. Commissioner, T.C. Memo. 1992-296, 63 T.C.M. (CCH) 3050, 3051-3052 (1992) ("Therefore, even assuming arguendo that petitioner is correct in his contention, the nunc pro tunc order issued by the Superior Court avails him nothing because he did not comply with the requirements set down in the Internal Revenue Code.").

Moreover, the superior court purported to give Mr. Nowak the general powers of a TMP appointed under section 6231(a)(7)--e.g., the power to file AARs and Tax Court petitions. Section 6231(a)(7) does not authorize any State court (or for that matter, any court) to do so; and any court's inherent authority to appoint a TMP, if it exists at all, should be narrowly delineated to harmonize with Federal tax law to the extent reasonably possible.

As was the case in 1983 W. Reserve Oil & Gas Co. v. Commissioner, 95 T.C. 51, we need not decide whether New Jersey courts have the inherent power to appoint a TMP because the New Jersey court that established the receivership and purported to authorize Mr. Nowak to act as TMP has at his request terminated the receivership. Consequently, there is no longer any party even purporting to act as

**[\*25]** TMP under statutory or inherent court power to pursue this litigation.  Rule 60(c); <u>Mont. Sapphire Assocs., Ltd. v. Commissioner</u>, 95 T.C. at 483; <u>Tempest Assocs., Ltd. v. Commissioner</u>, 94 T.C. 794, 801-802 (1990); <u>Universal Tr. 06-15-90 v. Commissioner</u>, T.C. Memo. 2000-390.

III.  <u>Conclusion</u>

Mr. Nowak now lacks the requisite authority to act as TMP on behalf of the partnerships regardless of whether he had that power when he filed the underlying AARs and petitions.  As a consequence, no party properly before the Court continues to argue that we have jurisdiction over these cases.  Further, the parties and those taxpayers affected by this litigation appear to now be satisfied with the status quo and the informal resolution of the tax matters disputes rendering these cases moot.  Consequently, we will grant respondent's motions to dismiss for lack of jurisdiction.[13]

To reflect the foregoing,

<u>Appropriate orders of dismissal for lack of jurisdiction will be entered</u>.

---

[13]We note that any remaining inequity in these cases is mitigated to some degree by the fact that all of the limited partners were permitted to file their own AARs relating to partnership items.